HEANEY, Circuit Judge,
dissenting.
Without doubt, the election process , that the Shakopee Mdewakanton Sioux Community must follow to amend its constitution is a federal proceeding governed by federal statute and regulations and within the oversight authority of the Secretary of the Interior. *-912 Nonetheless, the Secretary is bound to follow the regulations he promulgated, and the plain language of section 81.13 provides that the election board’s determinations of voter eligibility “shall be final.” This finality rule recognizes that determining tribal membership is the very essence of sovereignty and such decisions should be made according to tribal law by a body with at least a majority Indian vote. The Secretary’s interpretation of the rule — that the Department’s duty to resolve challenges to election results includes revisiting questions of voter eligibility previously decided by the election board — is plainly erroneous and inconsistent with the language of the regulations. See Shalala v. St. Paul-Ramsey Med. Ctr., 50 F.3d 522, 529 (8th Cir.1995) (declining to defer to Secretary’s interpretation that read additional unwritten terms into an otherwise unambiguous rule). Moreover, the agency’s interpretation has the effect of indefinitely postponing the election to amend the Community’s constitution which contravenes Congress’ expressed intent that Secretarial elections proceed within the strict time lines set forth in 25 U.S.C. § 476. Therefore, I dissent from the majority view that the agency interpretation of its regulations is reasonable.
I.
In the Indian Reorganization Act of 1934 (IRA), Congress explicitly acknowledged Indian tribes’ right to organize and to adopt or amend their own constitutions, 25 U.S.C. § 476(a), and instructed the Secretary of the Interior to call and conduct federal elections for this purpose, 25 U.S.C. § 476(c). Congress amended the IRA in 1988 adopting strict time lines to ensure that such elections proceed without undue delay: The Secretary must hold an election to ratify an amendment to a tribe’s constitution and bylaws within ninety days after receipt of a tribal request for an election. 25 U.S.C. § 476(c)(1)(B). Moreover, if a Secretarial election results in the adoption of a constitutional amendment, the Secretary must act within forty-five days of the election to either approve the amendment or make a finding that the amendment is contrary to applicable laws. 25 U.S.C. § 476(d)(1). If the Secretary fails to act on a proposed amendment within the forty-five-day period, the statutory scheme deems the Secretary’s approval as given. 25 U.S.C. § 476(d)(2). As the Assistant Secretary acknowledges in this ease, “the need to get the issue before the voters in a timely manner has become a congressional mandate.” (Ap-pellee’s Supp.App. at 35 (Letter from Ada Deer, Assistant Secretary-Indian Affairs, to Denise Homer, Director of the Minneapolis Area Office of the Bureau of Indian Affairs of 6/2/95 at 2).)
Congress delegated to the Secretary authority to prescribe rules and regulations to govern tribal-reorganization elections under the IRA. Pursuant to that authority, the Secretary promulgated the regulations at issue in this case. The regulations establish an election board — consisting of one BIA representative (acting as chair) and two tribal representatives — which is charged with ensuring that an election is conducted in compliance with the procedures set forth in the regulations. 25 C.F.R. § 81.8(a). The election board must oversee voter registration, including notifying eligible voters of the need to register, 25 C.F.R. § 81.11(a), and posting an official list of registered voters at least twenty days prior to the election, 25 C.F.R. § 81.12. In addition, the regulations charge the election board with resolving eligibility disputes in the following manner:
The election board shall determine the eligibility of any written claim to vote presented to it by one whose name does not appear on the official list of registered voters as well as any written complaint of the right to vote of anyone whose name is on the list. Its decision shall be final. It shall rule on all claims no later than ten days before the election. Any claim not presented at least ten days before the election shall be disallowed.
25 C.F.R. § 81.13 (emphasis added). The regulations further provide that after the election, qualified voters[2] can contest election results with the Secretary:
*-911 Any qualified voter, within three days following the posting of the results of an election, may challenge the election results by filing with the Secretary ... the grounds for the challenge, together with substantiating evidence. If in the opinion of the Secretary, the objections are valid and warrant a recount or new election, the Secretary shall order a recount or new election. The results of the recount or new election shall be final.
25 C.F.R. § 81.22 (emphasis original).
II.
In this case, the Community leadership initiated the process to amend the Community’s constitutional membership requirements in 1994. The Constitutional Amendment Committee of the General Council drafted proposed amendments and, on June 10,1994, the General Council submitted a formal request for a secretarial election pursuant to section 476. Due to concerns over the proposed amendments, the Secretary did not call for or hold an election within the ninety days mandated by the IRA After negotiating with the Secretary, however, the Community modified its proposed amendments and, on February 17, 1995, the Secretary authorized the Minneapolis Area Director of the BIA to conduct the election.
In accordance with the regulations, the BIA and the Community established an election board consisting of a BIA representative acting as chair and two tribal representatives. On March 8, 1995, the Community provided the BIA with a list of 116 persons it recognized as enrolled members of the Community. From that, a list of registered voters containing 111 names (minors and nonresidents from the previous list were excluded) was posted on March 29, 1995. The regulatory deadline for filing challenges to the registered voter list with the election board was noon on April 6, 1995, by which time challenges had been filed to more than 50% of the names on the registered voter list. The election board met on April 6 and 7,1995 and ruled on the challenges to voter eligibility. With one exception, the election board resolved every challenge by unanimous decision. The board posted a revised list containing the names of sixty-seven eligible voters on April 7,1995.[3]
An election was held on April 19, 1995 in which those persons on the voter registration list of April 7, 1995 were permitted to vote. The proposed constitutional amendment passed by a vote of thirty-five to twenty-seven. The election results were certified by the election board on the day of the election. Shortly after the certification of the election results, two groups of Community members filed challenges with the Secretary concerning the election board’s voter-eligibility determinations. Taken together, the challenges alleged that twenty-two persons voted who should not have been allowed to vote and that eighteen persons who were found ineligible should have been permitted to vote.
Forty-three days after certification (and two days before the constitutional amendment would have been deemed effective by operation of law) the Secretary announced that he could not approve the election results due to irregularities in the determination of voter eligibility. The Department’s procedure to redetermine voter eligibility is set *-910 out in a letter by the Assistant Secretary in which she calls for the appointment of an ALJ to determine- the blood quantum of twenty-three challenged individuals. The Assistant Secretary will review the ALJ’s determinations and render a final decision for the Department. According to the Assistant Secretary’s letter, the date of a new election to amend the Community’s Constitution will be not less than thirty nor more than sixty days after she approves the administrative determinations. In other words, the secretarial election has been indefinitely suspended by the Department.
III.
The plain language of the regulations unambiguously gives the election board the authority to resolve voter eligibility disputes and makes its determinations final. The Secretary, therefore, is bound to recognize the election board’s determinations as final, particularly absent some claim that the board acted outside its authority. As written, the regulations give deference to what is an already watered-down notion of Indian sovereignty in that it gives tribal members a majority voice in the all-important membership determinations. Moreover, it recognizes the congressional mandate to move the election process forward without unnecessary delay.
Although the Department asks us to find ambiguity, the regulations clearly set out that the election board’s determinations of voter eligibility are final. It is therefore apparent that the Secretary’s duty to resolve challenges by qualified voters does not cany with it the authority to revisit the election board’s final determinations of voter eligibility. The Secretary interprets the word final in section 81.13 to mean final for the election board so that an election can proceed, but not final for the Department. This reading is nonsensical and runs counter to the balance carefully struck by Congress. The Secretary simply does not get two bites of the apple. He cannot delegate a specific responsibility to the election board, make the board’s decision final, and then revisit the issue due to dissatisfaction in the outcome.
Perhaps the most troubling aspect of this case is the practical result of the Secretary’s decision. The election process initiated by the Community in 1994 is no closer today than when it began. The Community faces a most unfortunate Catch-22: The only process by which it can modify its membership requirements to the satisfaction of the United States is a secretarial election which is now indefinitely postponed until the Secretary determines the Community’s membership to his satisfaction. I cannot join in the majority’s conclusion that such a result is reasonable.

. It appears that a qualified voter is any person who had been registered to vote in the election. Although the regulations do no.t explicitly define the term, they define "registration'' as "the act *-911 whereby persons, who are eligible to vote, become entitled or qualified to cast ballots by having their names placed on the list of persons who will be permitted to vote.” 25 C.F.R. § 81.1(o) (emphasis added). Thus, although this regulation does not permit the Secretary to hear a challenge brought by a person who was not registered to vote, nothing in the language explicitly prevents a registered voter from bringing a challenge to the overall composition of the voter registration list.

. The initial list of enrolled members contained the names of all persons enrolled in the Community whose membership is recognized by the tribal leadership regardless of his or her technical eligibility under the 1969 constitution. In contrast, the revised list of eligible voters included only those persons who were constitutionally eligible to vote, as dictated by federal law. Although the Community’s position was that all persons recognized by the General Council as members should be eligible to vote in the secretarial election, the Community representatives on the election board deferred to the BIA position that eligibility determinations had to be made in accordance with the membership requirements as they were set out in Article 2 of the Shakopee Mdewakanton Constitution. (See Appellant’s App. at 129 (transcript of election board proceedings at 36:9-18).)